UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMIE LEE THOMPSON
            Plaintiff,

                                                    Case No. 05-74638
v.                                                  Judge Avern Cohn

THOMAS VIDA, JAMES KAVALICK,
JEFFREY IAFRATE, RONALD BALMER,
ERIC SHIMMEL, ROBERT MYSZENSKI,
BRENT HUMMEL, and WAYNE MOE,
            Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This is a civil rights case under 42 U.S.C. § 1983.  Plaintiff Jamie Lee Thompson (Thompson) alleges that the defendants, eight (8) Oakland County Deputy Sheriffs, violated his Fourth Amendment rights in using excessive force while arresting him and subsequently detaining him at the Oakland County Jail.  Thompson also claims the spoliation and destruction of evidence.  Specifically, Thompson alleges that the defendants destroyed the audio portion of a video tape recording of his arrest.  Before the Court is the defendants' motion for summary judgment.  For the reasons that follow, the motion will be granted in part and denied in part.

### II.  Background[1]

---

[1]   The background is gleaned from the parties' papers.  The parties did not follow the Court's summary judgment motion practice guidelines.  Neither party filed a statement of facts not in dispute or a counter-statement of facts.  The parties also failed to file exhibits in a separate, indexed and labeled appendix.  Finally, neither party

1

On January 24, 2004, between 1:30 to 2:00 a.m., Thompson was walking or running across 24 Mile Road in the City of Lake Orion, Michigan.  Thompson was stopped by Deputy Thomas Vida (Vida).  Vida says that he stopped Thompson because he heard a call from the Lake Orion Police Department on a harassment complaint and was suspicious that Thompson might be the individual.  Vida says that asked Thompson if he could question him and also asked him to get into the back of the patrol car because it was cold outside and he thought that Thompson was not properly dressed for the winter weather.  Thompson agreed to talk to Vida, and got into the patrol car.  Vida drove to a nearby carwash.  Thompson gave Vida his drivers license and Vida ran it though an identification system and discovered an outstanding arrest warrant on a possession of marijuana charge.  Vida says that he communicated over his radio that he was questioning someone, and  additional law enforcement personnel arrived shortly thereafter.[2]  One of these officers was Deputy James Kavalick (Kavalick).  Kavalick's patrol car was equipped with a camera that recorded some of the alleged actions.

The parties contest the facts from this point forward.  Thompson says that he was told that he was under arrest on an outstanding warrant and that Vida and Kavalik took him out of the patrol car and searched him.  Thompson says that during the search he was leaning over the trunk on the driver's side of the patrol car.  Thompson says that

_____

provided the Court with copies of the cases supporting their positions, with the relevant portions highlighted.  For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/cohn/motion.htm.

[2] Thompson says that the other law enforcement personnel included Deputy Sheriff Champion, Lieutenant Rossman, Sergeant Walker and an unidentified officer dressed in riot gear.  These individuals are not named as defendants.

Vida slammed him down against the trunk and punched him in the kidneys, and that other officers kicked him from behind. Thompson says that during this time, he did not verbally or physically resist the search. Thompson says he was then handcuffed and brought to the door of the patrol car. He states that while Vida was placing him into the patrol car, Vida placed his hand on top of his head and roughly rammed the side of his head and neck horizontally into the doorframe, instead of guiding his head vertically downward so that he would not hit the car.

Thompson says that a short time later, he was removed from the patrol car and searched for a second time. Thompson says that Vida and Kavalick roughly shoved him by the neck to the back of the patrol car and then slammed him into the rear corner panel of the car before placing him into the back seat.

Thompson says that after a few minutes he was forcefully dragged out of the patrol car for a third time, and patted down once more. Thompson says that Lieutenant Rossman (Rossman) berated and yelled at him, poked him in the chest with his finger, and challenged him to a fight. Thompson says that Kavalick then slammed him into the patrol car and that many of the officers kicked him. Thompson says that Kavalick next dragged him from the trunk area back to the driver's side rear door and then "battle rammed" him (threw him headfirst) into the side of the patrol car. Thompson says that two discs popped in his back at this time. Thompson says the officers appeared to begin to place him into the back seat again, but instead, they all crowded around him. Thompson says that Vida opened up the driver's side door and removed a foot and a half long flashlight. Thompson says he was taken to the back of the patrol car and that Vida struck him on the head with a flashlight four or five times, and that other officers

3

also hit his body.  Thompson says that he passed out during the beating and was shoved back into the car.  Thompson says that at this point he was  bleeding from the head.  Thompson says that he knows from the video tape that all the other officers except Vida left at this point.  Thompson says that he flitted in and out of consciousness for the next few minutes, but remembers that he woke up at one point on Church Street and that EMS was treating him for his injuries.[3]

Thompson was then taken to Oakland County Jail.  He says that he regained consciousness at this time and that Vida told him to get out of the patrol car.  Thompson says that he cursed at Vida and told him that he needed help because of his injuries related to the beating during his arrest.  He says that Vida yanked him out by his shirt and took him to what he referred to as the "Bam Bam" room.  Thompson says that several deputies were present including Ronald Balmer (Balmer), Eric Shimmel (Shimmel), Jeffrey Iafrate (Iafrate), Robert Myszenski (Myszenski), Brent Hummel (Hummel), and Wayne Moe (Moe). There, Thompson says that he was told to get down on his hands and knees, but that he had trouble doing so because of his injuries.  He says that one of the deputies knocked him down, placed shackled on his feet, which he attached to his handcuffs with a rope.  He says that Vida, Balmer, Shimmel, Iafrate, Myszenski, HUMMEL, and Moe then proceeded to beat him by kicking and stomping on his side, ribs, and on his head and face.  Thompson believes that it was at this time that his eardrum was ruptured and he began to bleed from the ear.  Thompson says that he was hit numerous times with "open hand stuns"  and "closed hand stuns".  He also says

---

[3] Thompson acknowledges that defendants dispute that he was treated by EMS. EMS has no record of treating him.

4

that at no time was he resisting or otherwise provoking the defendants.  Thompson says that he lost consciousness and that he was eventually taken to North Oakland Medical Facility (the hospital) by Hummel, Moe, and Vida.  Thompson says that either Hummel or Moe continued to hit him on the head at the hospital.  Thompson says that  received twelve stitches to his head at the hospital.  Thompson says that when he bailed himself out of jail, his parents took him to Genesis Health Center where he was diagnosed with a ruptured ear drum, trauma to his head, and two ruptured discs in his back.[4]  Thompson says that he was released with a neck brace and instructed to get seek further medical attention.  Thompson says that he has been on work disability because of his injuries and had gone for rehabilitation for many months and seen an ear specialist, a neurologist, and a psychiatrist.

    The defendants' version of the facts differ significantly.  Kavalick states in a police report created on the night of the incident that Thompson appeared highly intoxicated, and possibly on drugs.[5]  Either he or Vida informed Thompson that he was being placed under arrest on an outstanding warrant.  Kavalick says Thompson was being uncooperative and that he and Vida had to grab Thompson's arms and hold his body still to place handcuffs on him.  Kavalick and Vida say that at this time Thompson informed them that he was carrying approximately $1200.00 in cash.  Vida and Kavalick say that they removed Thompson's wallet and placed it into an evidence bag.  Kavalick

---

    [4]  Neither party has produced medical documentation regarding Thompson's alleged injuries.

    [5]  No breathalyser was administered.  Thompson admits that he had three drinks earlier that night but denies being intoxicated.

and Vida say that when they attempted to return Thompson to the patrol car, he refused to enter and pushed his body back against Kavalick, and was yelling expletives at them. Vida says that he had to grab Thompson and push him into the patrol car.  Vida and Kavalick say that Thompson accused them of taking his money, so when Rossman and Walker arrived, Vida and Kavalick removed Thompson from the car for a second time and counted his money in front of him, placed it back into the evidence bag, and placed Thompson back into the car for transport to the Oakland County Jail.  Vida and Kavalick testified at their deposition that no time during the arrest did they or any other officer strike Thompson or use weapons of any kind used against him.  They say that the videotape of the arrest clearly supports their version of the facts.

Vida says he then drove Thompson to the Oakland County Jail sallyport.  Vida says that Thompson refused to get out of the car, and cursed at him and stated that he needed help getting out of the car.  Vida says he reached in and grabbed plaintiff and pulled him from the car.  Vida says that Thompson resisted him, tried to knee him in the crotch area, and prepared to spit in his face.  Vida says that in order to control him, he pushed Thompson into the rear quarter panel of the car, causing a dent.  Vida says that Thompson continued to struggle and resist him as they entered the main door of the jail. Vida says that the lock to main door had been released and that because Thompson continued to struggle and resist him, they fell through the door and onto the cement floor.  Balmer says that he was notified by the booking clerk that there was a problem out on the sallyport and that Vida needed assistance.  Balmer says that he was joined by Iafrate and Myszenski.  Balmer says that he saw Thompson laying face down on the concrete, and that he was trying to get up and was yelling threats at Vida.  Iafrate

6

testified at his deposition that when he arrived Thompson was laying on his back kicking at Vida. Iafrate says that he secured Thompson head by applying pressure with his fingers to Thompson's hypoglossal (a pressure point that runs underneath the jawline). The defendants says that Thompson continued to resist their orders to walk and stop resisting them and that he was twisting his body away and shouting physical threats at Vida and the other deputies. Iafrate says that he applied two (2) "open- handed stuns" to Thompson's head to control him.

Balmer says that when the deputies finally got Thompson to an observation cell, he ordered Thompson to get on his knees to be shackled.[6] While Balmer says that Thompson complied with the order, Iafrate says that Thompson resisted and that he was helped/guided onto his hands and knees, then onto his stomach and chest to be searched. Vida says that Thompson refused to go down on his knees, and that one of the deputies swept Thompson's feet up from under him with his foot. Vida says that Thompson received the cut to his head at this point from falling to the ground.

Iafrate says that Thompson struggled while they were patting him down and attempting to shackle him in the observation room. Iafrate says that when Thompson refused to listen to his verbal commands, he applied pressure to Thompson's mandibular angle (a pressure point at the base of the ear and jawbone), and also applied two more open handed stun to the back of his head

Once he was shackled, Vida, Shimmell, Balmer, and Iafrate took him to the jail clinic to be evaluated by the nurse. The defendants say that Thompson would

---

[6] The deputies deny that the foot shackles are connected to the handcuffs by a rope, as Thompson contends.

periodically shout and struggle on the way to the clinic.  Blamer says he applied one open handed stun to the right side of Thompson's face.  Shimmell says that Thompson refused to walk at several points and that he ignored his verbal commands.  Shimmell says that he applied digital tip pressure to Thompson's Hypoglossal once until Thompson complied, and that he applied digital tip pressure to Thompson's jugular notch once.  Vida, Shimmel, Balmer and Iafrate state that Thompson also attempted to kick the nurse and that Iafrate applied one closed hand stun to his peroneal (thigh) nerve.  The nurse instructed the deputies to take Thompson to North Oakland Medical Center to receive aid for the laceration to his head.  Hummel says that Thompson continued to display hostile behavior and refused verbal direction and on multiple occasions lunged off the medical gurney in the direction of the deputies and had to be physically restrained by pushing him onto the gurney.

### III.  Standard for Summary Judgment

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the

8

material facts is not enough; "the mere existence of a scintilla of evidence" in support of

the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must

present "significant probative evidence" in support of its opposition to the motion for

summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8

F.3d 335, 340 (6th Cir. 1993); Anderson, 477 U.S. at 249-50.  Additionally, and

significantly, "affidavits containing mere conclusions have no probative value" in

summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir.

1968).

The Court must decide "whether the evidence presents a sufficient disagreement

to require submission to a [trier of fact] or whether it is so one-sided that one party must

prevail as a matter of law."  In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994)

(quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light

most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum

Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing

evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson,

477 U.S. at 255.  Only where there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law may summary judgment be

granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

### IV. Analysis

### A. Thompson's Excessive Force Claim

Thompson argues that under 42 U.S.C. §1983, defendants' actions constitute the

use of excessive force in violation of the Fourth Amendment to the United States

Constitution.  Section 1983 creates no substantive rights on its own; rather, it is a

vehicle by which a plaintiff may seek redress for deprivations of rights established in the

Constitution or federal law.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  "To

successfully establish a claim under Section 1983, a claimant must show that he or she

was deprived of a right secured by the Constitution and the laws of the United States by

one acting under the color of law."  Ahlers v. Schebil, 188 F.3d 365 (6th Cir. 1999)

(internal citations omitted).

Here, the defendants claim qualified immunity.  In Saucier v. Katz, the Supreme

Court explained that the threshold question in determining whether an officer should be

granted immunity is whether "[t]aken in the light most favorable to the party asserting

the injury, do the facts alleged show the officer's conduct violated a constitutional right?"

533 U.S. 194, 201-202 (2001).  The Supreme Court further explained that:

> [i]f no constitutional right would have been violated were the allegations
> established, there is no necessity for further inquiries concerning qualified
> immunity. On the other hand, if a violation could be made out on a
> favorable view of the parties' submissions, the next, sequential step is to
> ask whether the right was clearly established.

Id.  While excessive force is generally determined by evaluating whether a police officer

acted as an objectively reasonable officer would, the relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted.  Id.

Where reasonable officers could differ in their determinations of whether an action is

objectively reasonable, the officer should be granted qualified immunity: "If the law did

not put the officer on notice that his conduct would be clearly unlawful, summary

10

judgment based on qualified immunity is appropriate." Id.

The right to be free from excessive force is clearly established. Graham v. O'Conner, 490 U.S. 386, 392-93 (1989). This right extends to the process of being arrested and detained.[7] The parties here disagree about the facts. Thompson says that the defendants repeatedly struck and beat him while he was not resisting arrest and complying with their orders. The defendants do not deny that many of the individual defendants struck or otherwise treated Thompson in a rough manner. Instead the defendant's argue that the use of force was reasonable because Thompson actively resisted their arrest under a valid warrant, and failed to comply with their verbal commands while being detained. Where a plaintiff has demonstrated that there is a genuine issue as to whether an officer has used excessive force in arresting or detaining him, summary judgment on the basis of qualified immunity is inappropriate because, "It is the province of the jury, not the court, to decide on the credibility of the defendant's account of the need to use force." Adams v. Metiva, 31 F. 2d 375, 387 (6th Cir. 1994). The court in Metiva, relied on the analysis in Brandenburg v. Cureton, 882 F.2d 211, 215-16 (6th Cir.1989), in which the plaintiff alleged that a police officer has

---

[7] See e.g., Ferguson v. Hall 33 F. Supp. 2d 608 (E.D. Mich. 1999)(genuine issue of fact existed as to whether officer used excessive force in handcuffing petitioner); Fultz v. Whittaker, 87 F.Supp.2d 695 (W.D.Ky, 2001) (genuine issue of fact existed as to issue of whether officer used excessive force during arrest where officer pepper sprayed the petitioner and held him around the neck); Adams. v. Metiva, 31 F.3d 375, 386 (6th Cir. 1994)(genuine issue of fact existed as to whether excessive force was used where petitioner alleged that arresting officer had sprayed him in the face with mace after he had been arrested and placed in patrol car); Moore v. City of Portage, 2002 U.S. Dist. LEXIS 14647 (genuine issue of fact existed as to whether officer whether excessive force was used when petitioner alleged that two or three police officers slammed him onto the hood of the police car while placing him in handcuffs.)

used excessive force by shooting her husband while serving a peace warrant.  The

court in Bradenburg stated that the determination of whether the officer's actions were

justified was a question for the jury:

> This circuit has noted that the question is whether "any officer in the
> defendant's position, measured objectively, would have clearly understood
> that he was under an affirmative duty to have refrained from such
> conduct." Although this is purely a legal question to be decided by the
> court, a court may not be able to make a determination if the exact
> character of the "actions" ... is unknown. [In such a case], the jury
> becomes the final arbiter of the [defendant's] claim of immunity, since the
> legal question of immunity is completely dependent upon which view of the
> facts is accepted by the jury. If the jury determines that [the defendant]
> fired on [the plaintiff] without a belief that someone was in danger of
> serious bodily injury, then as a legal matter no reasonable officer could
> believe that such gunfire would not violate another's constitutional rights.
> On the other hand, if the jury believes [the defendant's]  version of the
> facts, he will be entitled to qualified immunity.

Id.  The same is true in the present case.  The legal question of immunity is completely

dependent upon which view of the facts is accepted by the jury.  As the Court of

Appeals for the Sixth Circuit stated in Holt v. Artis, 843 F.2d 242, 246 (6th Cir.1988),

> if the defendants arrested the plaintiff without probable cause, or subjected him
> to more force than was reasonably necessary under the circumstances, then
> they are liable for his injuries. What they believed is not at issue, and they cannot
> have acted in good faith.

Thompson says that the eight (8) individual defendants used excessive force

against him.  Therefore, an individual-by-individual analysis of each deputy's actions is

required to determine whether Thompson has demonstrated that a genuine issue of

material fact exists as to that deputy's conduct.  Where Thompson has asserted

excessive force, and the record is not clear, the jury must decide whether that particular

defendant should be held liable.  If the jury determines that a defendant struck or beat

Thompson while he was not resisting arrest and complying with orders, as a matter of

12

law no reasonable officer would believe that such conduct would not violate plaintiff's constitutional rights.  Metiva, 31 F. 2d at 387.

**Vida:** Vida was present during Thompson's arrest and also at the jail. Thompson says in his sworn deposition testimony that Vida subjected him to three physical searches during which time he slammed him down against the trunk of the patrol vehicle; punched him in the kidneys twice; rammed his head and neck against the door frame of the patrol car; struck him four or five times with a flashlight.  Vida says that he he pushed Thompson inside the patrol car because he was resisting arrest.  Both Thompson and Vida claim that the videotape of the arrest supports his version of the arrest.  The Court has viewed the videotape of the arrest.  It was recorded in the early morning, while it was still dark, and the video lacks sound.  It is difficult to tell what Thompson and Vida are doing at all times.  To resolve the disputed versions of the events, the Court would be required to determine which of the parties' testimony is more credible.  Such an exercise is prohibited at the summary judgment stage, as only the trier of fact may determine credibility, weigh evidence, and draw inferences.  See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986).  Therefore, summary judgment is inappropriate as to Vida's actions during the arrest.

Thompson further says that Vida used excessive force against him at the jail by pulling him out of the patrol car at the sallyport, and participating in beating him in the observation cell.  Vida said that he pushed Thompson into the rear end of the patrol car at the sallyport because he was attempting to kick and spit on him.  Vida has offered no other evidence besides for his sworn deposition testimony to support his assertion that the force he used was reasonable, or to refute Thompson's version of the facts.

13

Because the Court would be required to determine which of the parties' testimony is more credible, summary judgment is inappropriate here.

**Kavalick**: Kavalick was present during Thompson's arrest.  Thompson says in his sworn deposition testimony that Kavlick subjected him to three physical searched during which time he shoved him by the neck to the back of the squad car and slammed him into the rear corner panel, dragged him from the patrol car to perform the third search; "battle rammed" him headfirst into the side of the patrol car; and beat him while Vida was hitting him with a flashlight.  During his deposition, Kavalick said that he had to hold Thompson's arms and hold him still while he was being arrested.  Like Vida, Kavalick has offered no other evidence besides for his sworn deposition testimony to support his assertion that the force he used was reasonable, or to refute Thompson's version of the facts.   Because the Court would be required to determine which of the parties' testimony is more credible, summary judgment is inappropriate here.

**Balmer**:  Balmer was present at the jail.  Thompson says in his sworn deposition testimony that Balmer participated in beating him in the observation cell and that Balmer hit him about the head on the way to the nurses station.  During his deposition Balmer said that he hit Thompson once on the side of the head because he was not complying with orders.  Balmer has offered no other evidence besides for his sworn deposition testimony to support his assertion that the force he used was reasonable, or to refute Thompson's version of the facts.   Because the Court would be required to determine which of the parties' testimony is more credible, summary judgment is inappropriate here.

**Iafrate**: Iafrate was present at the jail.   Thompson says in his sworn deposition

14

testimony that Iafrate participated in beating him in the observation cell; and hit him in the nurses station.  During his deposition, Iafrate said that he secured Thompson head by applying pressure with his fingers to Thompson's hypoglossal (a pressure point that runs underneath the jawline), and says that he applied two (2)  "open- handed stuns" to Thompson's head to control him on the way to the observation cell.  Iafrate further says that when Thompson refused to listen to his verbal commands on the observation cell, he applied pressure to Thompson's mandibular angle (a pressure point at the base of the ear and jawbone), and also applied two more open handed stun to the back of his head.  Finally, Iafrate says that he applied one open-handed stun to Thompson's peronial nerve in the nurse's office.   Iafrate has offered no other evidence besides for his sworn deposition testimony to support his assertion that the force he used was reasonable, or to refute Thompson's version of the facts.   Because the Court would be required to determine which of the parties' testimony is more credible, summary judgment is inappropriate here.

**Shimmel**: Shimmel was present at the jail.   Thompson says in his sworn deposition testimony that Shimmel participated in beating him in the observation cell and also hit him on the way to the nurses station.  During his deposition Shimmel said that he applied digital tip pressure to Thompson's jugular notch and hypoglossal. Shimmel has offered no other evidence besides for his sworn deposition testimony to support his assertion that the force he used was reasonable, or to refute Thompson's version of the facts.   Because the Court would be required to determine which of the parties' testimony is more credible, summary judgment is inappropriate here.

**Myszenski**: Myszenski was present at the jail. Thompson says in his sworn

15

deposition testimony that Myszenski participated in beating him in the observation cell.
Myszenski says that he did not hit Thompson.  Myszenski has offered no other evidence
besides for his sworn deposition testimony to support his assertion that he did not
participate in beating Thompson in the observation cell.  Because the Court would be
required to determine which of the parties' testimony is more credible, summary
judgment is inappropriate here.

**Hummel and Moe**: Hummel and Moe were present at the jail. Thompson says
in his sworn deposition testimony that Hummel and Moe participated in beating him in
the observation cell, and that either Hummel or Moe repeatedly hit him on the head on
the way to the hospital.  As to whether Hummel of Moe hit him on the way to the
hospital, Thompson says that he was unconscious at the time but says that Hummel or
Moe admit to hitting him in their police statements.  Thompson has failed to produce any
statement in which Hummel or Moe state that they hit Thompson on route to the
hospital.  Therefore Thompson has not demonstrated that there is a genuine issue of
fact as to whether Hummel or Moe hit him on route to the hospital.  However, neither
Hummel nor Moe has offer evidence other than their sworn deposition testimony to
support their assertion that they did not participate in beating Thompson in the
observation cell.  Because the Court would be required to determine which of the
parties' testimony is more credible, summary judgment is inappropriate here.

### B.   Spoliation and Destruction of Evidence

The videotape of Thompson's arrest recorded from the camera on Kavalick's car
does not have sound.  Thompson contends that the audio portion was destroyed or
purposefully turned off by Kavalick in order to conceal the defendants' actions.

16

Thompson points that Kavalick admitted at his deposition that the audio was operational when he tested it on the date of the incident, at an earlier time. The defendants deny that the audio portion of the video was destroyed or purposefully turned off. They state that it is clear from the videotape that the audio simply was not working. They point out that there is a portion in the tape where the microphone seems to activate with some buzzing noises, then immediately deactivates. The defendants say that the deputies did not create the noise, and that this buzzing indicates that the audio was defective.

There is not sufficient evidence to sustain this claim past summary judgment. Kavalick testified at his deposition that he was in control of the audio through a button contained on his person. He stated that he either forgot to turn the audio on or that it was out of batteries during the incident. Thompson has not presented evidence that refutes Kavalick's explanation, which was given under oath. Accordingly, the motion for summary judgment will be granted as to this count.

## V.  Conclusion

For the reasons stated above the Court DENIES the defendants' motion for summary judgment as to Thompson's claim of excessive force and GRANTS defendants' motion for summary as to Thompson's claim of spoliation and destruction of evidence.

**05-74638 Thompson v. Vida, et al**

A status conference is scheduled for **Tuesday, February 06, 2007 at 2:00 p.m.**

SO ORDERED.

Dated:  January 5, 2007                     s/Avern Cohn
                                           AVERN COHN
                                           UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 5, 2007, by electronic and/or ordinary mail.


                                           s/Julie Owens
                                           Case Manager, (313) 234-5160

18